IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED
IN OPEN COURT
JUN 6 2019
CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 1:19cr176 |
| | ) | |
| v. | ) | Count 1: 18 U.S.C. § 1349 |
| | ) | (Conspiracy to Commit Bank Fraud) |
| ALKESH TAYAL, | ) | |
| (Counts 1-5) | ) | Counts 2 – 4: 18 U.S.C. §§ 1344 and 2 |
| | ) | (Bank Fraud) |
| and | ) | |
| | ) | Count 5: 18 U.S.C. §§ 1956(h) and 2 |
| GERALD ALEX BOUTCHER | ) | (Money Laundering Conspiracy) |
| (Counts 1, 5) | ) | |
| | ) | Forfeiture Notice |
| | ) | |
| Defendants. | ) | |

**Indictment**

June 2019 Term – at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

**INTRODUCTORY ALLEGATIONS**

At all times relevant to this Indictment, unless otherwise stated:

*Relevant Persons, Entities, and Terms*

1. RBS Financial Products, Inc. ("RBS") operated in the Washington, D.C. metropolitan area, including in the Eastern District of Virginia. Among other things, RBS provided personal and commercial lending services for interests in real estate. As such, RBS was a financial institution within the meaning of Title 18, United States Code, Section 20.

2. Nationstar Mortgage, Inc. d/b/a Mr. Cooper ("Nationstar") operated in the Washington, D.C. metropolitan area, including in the Eastern District of Virginia. Nationstar provided servicing of mortgage loans for various companies, including RBS.

3. JPMorgan Chase Bank, N.A. ("Chase") and Wells Fargo Bank, N.A. ("Wells

1

Fargo") operated in the Washington, D.C. metropolitan area, including in the Eastern District of Virginia. Chase and Wells Fargo were financial institutions within the meaning of Title 18, United States Code, Section 20.

4. Title Company A was a title and escrow company that serviced the Washington, D.C. metropolitan area, including in the Eastern District of Virginia.

5. K.W. was a realty brokerage company that serviced the Washington, D.C. metropolitan area, including in the Eastern District of Virginia.

6. Defendants ALKESH TAYAL ("TAYAL") and GERALD ALEX BOUTCHER ("BOUTCHER") were residents of the Commonwealth of Virginia. From at least in or around 2012 through on or about January 30, 2017, TAYAL worked as a licensed realtor for K.W. BOUTCHER has held a realtors license and has worked in the real estate industry for over 25 years.

7. TAYAL was the owner of United Project Management Group, LLC ("UPMG"), a property management company based in the Commonwealth of Virginia that was incorporated on or about April 30, 2008. On or about July 1, 2010, TAYAL opened a business bank account with Bank of America in the name of UPMG, account number ending in 1649. TAYAL was the only signatory on the account. TAYAL maintained additional business accounts for UPMG with Bank of America, account numbers ending in 0970 and 7913.

8. On or about May 6, 2014, 9107 Dara Lane LLC was incorporated in the Commonwealth of Virginia. BOUTCHER was listed as the sole member of 9107 Dara Lane LLC.

9. BOUTCHER maintained a personal checking account with Bank of America, account number ending in 8645.

10. On or about May 22, 2014, S.S., a licensed realtor in Commonwealth of Virginia, created Mclean Real Estate Development Group LLC ("Mclean Group"). TAYAL (through UPMG) and S.S. each owned 50% of the Mclean Group. BOUTCHER, UPMG, and S.S. were listed as Managers of the Mclean Group.

11. 9107 Dara Lane was a single-family residential home located in Great Falls, Virginia, within the Eastern District of Virginia. From in or around 2007 to in or around 2014, TAYAL was the sole owner of 9107 Dara Lane.

12. 7231 Allan Avenue was a single-family residential home located in Falls Church, Virginia, within the Eastern District of Virginia. On or about August 4, 2014, 7231 Allan Avenue was purchased by the Mclean Group.

13. 1205 Garfield Street #PH5 was a two-bedroom condominium located in Arlington, Virginia, within the Eastern District of Virginia. From on or about April 7, 2006, to on or about January 15, 2015, TAYAL was the sole owner of 1205 Garfield Street #PH5.

14. R.T. was the co-parent of TAYAL's child and resided at 9107 Dara Lane from at least in or around 2010 to the present.

15. C.S. was a licensed realtor in the Commonwealth of Virginia and an employee of K.W.

16. Short sale was a term used for a transaction in which a homeowner requests to sell a home for less than the amount owed on the mortgage to be released from their obligation to repay the primary mortgage balance to avoid foreclosure. At times, financial institutions permitted short sales where the current borrower was unable to make the required loan payments.

17. The term "flipping" is used by real estate investors to describe the process through which investors buy, rehab, or quickly resell a property for profit.

## COUNT ONE
## (Conspiracy to Commit Bank Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

18. The allegations contained in paragraphs 1 through 17 of this Indictment are realleged as if fully set forth herein.

19. From at least in or around June 2012 and continuing through at least in or around October 2016, in the Eastern District of Virginia and elsewhere, the defendants, ALKESH TAYAL and GERALD ALEX BOUTCHER, did knowingly and intentionally conspire with each other and with others, both known and unknown to the Grand Jury, to commit bank fraud, in violation of Title 18, United States Code, Section 1344; that is, the defendants knowingly and intentionally conspired with each other and with others, both known and unknown, to execute a scheme and artifice to defraud RBS, Chase, and Wells Fargo, financial institutions under the meaning of Title 18, United Sates Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property, under the custody and control of those financial institutions by means of materially false and fraudulent pretenses, representations, and promises.

### *The Purpose of the Conspiracy*

20. It was the purpose of the conspiracy for TAYAL to fraudulently receive relief from real estate loans through seeking short sale approvals for properties owned by TAYAL and for TAYAL to fraudulently receive or attempt to receive real estate commissions associated with the short sale transactions for his properties when TAYAL was not entitled to receive such commissions.

21. It was a further purpose of the conspiracy for TAYAL, BOUTCHER, and others to obtain properties below market value at a loss to the bank and "flip" the properties for profit.

*The Manner and Means*

TAYAL, BOUTCHER, and their co-conspirators employed various manners and means in furtherance of the conspiracy and scheme and artifice to defraud, including the following:

22. TAYAL and BOUTCHER submitted approval letters and signed affidavits to various banks misrepresenting, among other things, that the short sale transactions in which both TAYAL and BOUTCHER were involved were "arm's length" transactions in which the buyer and seller of a given property were unrelated and unaffiliated by family, marriage, or commercial enterprise when, in fact, as TAYAL and BOUTCHER well knew, they were affiliated by commercial enterprise.

23. TAYAL and BOUTCHER further represented that TAYAL was not to receive funds or commissions from the short sale of the various properties when, in fact, TAYAL received commissions from the short sale of 9107 Dara Lane and 7231 Allan Avenue, and attempted to receive the commission for 1205 Garfield Street #PH5.

24. In addition, TAYAL and BOUTCHER utilized various individuals and entities to conceal the true nature of TAYAL and BOUTCHER's involvement with the short sales, including representing that various other individuals served as realtors for the short sales when, in fact, these individuals did not serve as realtors for the short sales.

25. For purposes of the short sale transactions, TAYAL was either the seller or a representative for the seller and BOUTCHER was either the buyer or a representative of the buyer. However, TAYAL and BOUTCHER never disclosed to the financial institutions that TAYAL would continue to benefit from the properties after the short sale transactions occurred, including paying a mortgage at a lower rate on 9107 Dara Lane and sharing in the profits of "flips" of 7231 Allan Avenue and 1205 Garfield Street #PH5.

26. TAYAL further permitted BOUTCHER to negotiate on behalf of the seller of each transaction to lower the amount the banks would accept for purposes of the short sale transactions.

### *Overt Acts*

27. TAYAL, BOUTCHER, and their co-conspirators committed overt acts in furtherance of the conspiracy in the Eastern District of Virginia and elsewhere, including the following:

### Acts Related to the Short Sale of 9107 Dara Lane Great Falls, Virginia

28. On or about October 30, 2013, in McLean, Virginia, within the Eastern District of Virginia, TAYAL authorized BOUTCHER to discuss a loss mitigation plan with Nationstar regarding TAYAL's mortgage loan for 9107 Dara Lane.

29. Subsequently, on or about May 14, 2014, TAYAL provided Nationstar with a "Hardship Letter" in which he claimed that he could no longer afford 9107 Dara Lane and requested permission to short sale the property. In the Hardship Letter, TAYAL represented that C.S. would serve as his agent for purposes of a short sale contract.

30. On or about July 10, 2014, Nationstar provided approval of the short sale contingent upon TAYAL meeting a number of conditions, including that he would not receive proceeds from the sale and that the transaction was an "arm's length" transaction.

31. On or about July 28, 2014, in McLean, Virginia, within the Eastern District of Virginia, 9107 Dara Lane LLC and TAYAL completed a HUD-1 settlement statement for the short sale of 9107 Dara Lane. BOUTCHER signed the HUD-1 as "Member and Manager" of 9107 Dara Lane LLC.

32. On the HUD-1 settlement statement, TAYAL and BOUTCHER falsely

represented that, at the time of closing, 9107 Dara Lane LLC would provide $84,252 in cash to complete the transaction when, in fact, TAYAL provided BOUTCHER with funds to make the payment on or about July 25, 2014, and July 28, 2014.

33. TAYAL and BOUTCHER never disclosed that the cash that was supposed to be paid by 9107 Dara Lane LLC was, in fact, paid by TAYAL.

34. On or about July 28, 2014, in McLean, Virginia, within the Eastern District of Virginia, TAYAL and BOUTCHER signed a short sale affidavit which stated, among other things: (1) that neither the seller nor buyer would receive any funds or commissions from the sale absent approval from Nationstar and RBS; (2) that the transaction was "arms length" between a seller and a buyer "unrelated or unaffiliated by family, marriage, or commercial enterprise;" and (3) that the seller could not remain in the property or otherwise obtain title or ownership of the property.

35. On or about July 28, 2014, in McLean, Virginia, within the Eastern District of Virginia, TAYAL also signed and provided an approval letter to Title Company A, in which he acknowledged, among other things: (1) that the seller was prohibited from receiving proceeds from the short sale unless approved by Nationstar and (2) that the transaction was an "arms length" transaction.

36. Based at least in part on the representations contained within the HUD-1 settlement statement and the short sale affidavit, Nationstar and RBS approved the short sale of 9107 Dara Lane for a contract price of $1,540,000. In total, the bank ultimately wrote off $2,226,176.41 it was owed.

*Commission for 9107 Dara Lane*

37. On or about May 6, 2014, C.S., at the direction of TAYAL, contacted Title Company A and instructed them to utilize two variations of K.W.'s name on the HUD-1 for purposes of dispensing commission for the short sale.

38. On or about May 9, 2014, TAYAL and BOUTCHER signed a sales contract that represented that C.S. was the seller's agent associated with K.W.M. and G.L. was the buyer's agent associated with K.W.R.

39. TAYAL and BOUTCHER never disclosed to Nationstar or RBS that G.L. did not, in fact, serve as the buyer's agent for the short sale.

40. Based on TAYAL and BOUTCHER's representation that $46,200 in commission would be paid to K.W.M. and $30,800 in commission would be paid to K.W.R, RBS approved a total of $77,000 in commission for the short sale.

41. On or about July 29, 2014, Title Company A wire transferred $77,000 to K.W., which represented commission purportedly due and owing to K.W.M and K.W.R.

42. On or about July 30, 2014, TAYAL sent an email communication to C.S. and K.W.'s transaction processors stating that "100%" of the commissions from the short sale of 9107 Dara Lane should come to TAYAL and go into his business account when, as TAYAL knew, he should not have received any commission for the short sale.

43. Subsequently, on or about August, 1, 2014, TAYAL received the commission from the short sale of 9107 Dara Lane into his UPMG Bank of America account ending in 1649.

44. TAYAL never disclosed to Nationstar or RBS that he received any of the commission from the short sale of 9107 Dara Lane.

*"Arms Length" Transaction & Ownership of 9107 Dara Lane*

45. Prior to the short sale of 9107 Dara Lane, TAYAL and BOUTCHER discussed providing appraisers from Nationstar with access to the property for determining its value, including deciding whether TAYAL or BOUTCHER would show the property to the appraisers.

46. Prior to the approval of the short sale of 9107 Dara Lane, as TAYAL and BOUTCHER knew, both TAYAL (through UPMG) and BOUTCHER were members of the Mclean Group.

47. TAYAL and BOUTCHER never disclosed their preexisting commercial relationship to Nationstar or RBS.

48. In addition, both TAYAL and BOUTCHER engaged in discussions with the entity who would provide 9107 Dara Lane LLC, the purported buyer of 9107 Dara Lane, with the financing for the short sale.

   a. For example, on or about April 30, 2014, BOUTCHER emailed the financing company with TAYAL copied and said, "Here is the appraisal we had done on 9107 Dara Lane. It appraised for $1,595,000 but the appraiser said it took everything he had to get it that low. We believe Nationstar will agree to a short sale in the $1,425,000 range. [TAYAL] believes the home, in its current condition, is worth $2.3M to $2.5M. I've copied [TAYAL] so that he can coordinate a date/time to give you access to see the property."

   b. On or about May 7, 2014, TAYAL emailed the financing company with BOUTCHER copied and said, "It was a pleasure seeing you today out at Dara Lane. I sincerely appreciate all that you are doing to help me out. I will do what I have been doing and show you excellent and prompt payment history."

49. After the short sale of 9107 Dara Lane to 9107 Dara Lane LLC, R.T. continued to reside at 9107 Dara Lane with TAYAL's child.

50. TAYAL continued to make monthly mortgage payments to the new mortgage noteholder after the short sale occurred.

51. Neither TAYAL nor BOUTCHER ever disclosed to Nationstar or RBS that TAYAL would, in fact, continue to pay the mortgage for 9107 Dara Lane, nor did they disclose TAYAL's discussions with the noteholder regarding payment of the mortgage.

52. On or about January 8, 2015, approximately six months after the close of the short sale transaction, in Fairfax County, Virginia, within the Eastern District of Virginia, TAYAL and BOUTCHER opened a business bank account with Bank of America in the name of 9107 Dara Lane LLC, account number ending in 9022. TAYAL and BOUTCHER both had signatory authority for the account and each was listed as a "Member" of 9107 Dara Lane LLC in the account opening paperwork.

53. TAYAL subsequently paid the registration fee for the renewal of 9107 Dara Lane LLC's corporate standing.

54. On or about October 7, 2016, in McLean, Virginia, within the Eastern District of Virginia, 9107 Dara Lane was refinanced and a new loan for $2,230,000 was secured on the property. 9107 Dara Lane LLC was the company listed on the closing documents, and BOUTCHER signed on behalf of the company. Both TAYAL and BOUTCHER were present for the closing on the refinance and both were listed as personal guarantors and signors for the new loan.

### Acts Related to the Sale of 7231 Allan Avenue Falls Church, Virginia

55. On or about May 16, 2014, the Mclean Group entered into a sales contract as the buyer for a short sale of 7231 Allan Avenue. BOUTCHER executed the sales contract on behalf of the Mclean Group.

56. The sales contract listed C.S. as the real estate agent for the seller of 7231 Allan Avenue when, in fact, TAYAL was the real estate agent for the seller of 7231 Allan Avenue.

57. BOUTCHER sent a series of email communications to the financing company for 7231 Allan Avenue to aid in concealing from Chase TAYAL's true involvement as a purchaser of 7231 Allan Avenue, including:

   a. On or about May 19, 2014, BOUTCHER informed the financing company that TAYAL was the purchaser for 7231 Allan Avenue through an entity called Capital Area Real Estate Group LLC.

   b. On or about May 20, 2014, BOUTCHER wrote that Chase would not allow Tayal to be the buyer because he was also the real estate agent in the deal and that BOUTCHER and TAYAL had decided to use 9107 Dara Lane LLC as the purchaser.

   c. That same day, BOUTCHER informed the financing company that the Mclean Group would be purchasing the property and asked that the approval letter be addressed to BOUTCHER as the manager of the McLean Group.

58. TAYAL and BOUTCHER never disclosed to Chase that TAYAL was a member of the Mclean Group.

59. By at least on or about July 3, 2014, TAYAL and BOUTCHER received closing instructions for the short sale from Chase that required, among other things: (1) that the buyer

and the seller provide full disclosure regarding all details of the transaction on the HUD-1 settlement statement; (2) that neither the seller nor the buyer were to receive any funds from the sale; and (3) that parties to the transaction sign an affidavit stating that the transaction was "arm's length."

60. On or about August 1, 2014, BOUTCHER, on behalf of the Mclean Group, signed an arm's length transaction affidavit stating, in part, that there were no special understandings between the seller, the buyer, and his/her agents, and that the agents were acting in the best interests of their respective principals.

61. On or about August 4, 2014, in McLean, Virginia, within the Eastern District of Virginia, BOUTCHER signed the HUD-1 settlement statement for the short sale purchase of 7231 Allan Avenue on behalf of McLean Group. In addition, BOUTCHER executed an "arm's length transaction" affidavit in which BOUTCHER represented that the transaction was negotiated by unrelated parties, each of whom was acting in his or her own self-interest, and that the sale price was based on fair market value property. As BOUTCHER and TAYAL knew, BOUTCHER and TAYAL exchanged communications regarding the costs of the short sale of 7231 Allan Avenue, including discussions about the value of 7231 Allan Avenue and TAYAL's plans for "flipping" 7231 Allan Avenue after the short sale.

62. Based on the representations made by TAYAL and BOUTCHER, Chase approved the short sale of 7231 Allan Avenue for a contract sales price of $280,000, including providing $16,800 as commission—$8,400 for K.W.R. and $8,400 for K.W.M.

63. On or about August 8, 2014, TAYAL received a portion of the commission from the short sale of 7231 Allan Avenue. However, TAYAL never disclosed to Chase that he intended to receive commission from the sale.

64. On or about August 21, 2014, the McLean group entered into a sales contract to "flip" the Allan Avenue property for $475,000.

### Acts Related to the Sale of 1205 Garfield Street #PH5 Arlington, Virginia

65. On or about July 9, 2014, TAYAL sent a hardship letter to Wells Fargo requesting to short sale 1205 Garfield Street #PH5 and listing C.S. as his agent for purposes of the sale.

66. On or about August 25, 2014, TAYAL and BOUTCHER signed a sales contract for the short sale of the Garfield property that represented that C.S. was the seller's agent associated with K.W.M. and G.L. was the buyer's agent associated with K.W.R.

67. On or about December 19, 2014, TAYAL and BOUTCHER signed a Help for American Homeowners ("HAFA") Affidavit which stated, among other things: (1) that the sale of the property was an "arm's length" transaction between the seller and the buyer; (2) that all agreements relating to the current sale or a subsequent sale were disclosed to the mortgage servicer; and (3) that neither the seller nor the buyer would receive any funds or commissions from the sale of the property.

68. On or about December 30, 2014, Wells Fargo tentatively approved a short sale of 1205 Garfield Street #PH5 which would be finalized upon the borrower/seller meeting a number of conditions, including, among other things, that the seller would not receive any proceeds from the sale and that the short sale transaction was an arm's length transaction.

69. On or about January 15, 2015, in McLean, Virginia, within the Eastern District of Virginia, 9107 Dara Lane LLC and TAYAL completed a HUD-1 settlement statement for the short sale of 9107 Dara Lane. BOUTCHER signed the HUD-1 as "Member and Manager" of 9107 Dara Lane LLC.

70. On the HUD-1, TAYAL and BOUTCHER represented that, at the time of closing,

9107 Dara Lane LLC, as an arm's length buyer, would provide $21,339.94 in cash to complete the transaction. On or about January 15, 2015, TAYAL withdrew $21,339.94 from the 9107 Dara Lane LLC Bank of America account ending in 9022. TAYAL and BOUTCHER never disclosed that TAYAL had access to the 9107 Dara Lane LLC bank account at the time of the short sale.

71. The HUD-1 provided that commission for the short sale would be paid to K.W.M. on behalf of the seller in the amount of $16,260, and K.W.R. on behalf of the buyer in the amount of $16,260.

72. TAYAL and BOUTCHER never disclosed to Wells Fargo that G.L. did not, in fact, serve as the buyer's agent for the short sale.

73. In addition, in the HAFA affidavit, TAYAL and BOUTCHER represented that there were no agreements, understandings, or contracts regarding a subsequent sale of the property when, as TAYAL and BOUTCHER knew, TAYAL and BOUTCHER intended to resell the property within two to three months of the short sale settlement.

74. Based on the representations TAYAL and BOUTCHER made in the HUD-1 and the HAFA affidavit, Wells Fargo finalized approval of the short sale for a contract sales price of $542,000. In total, Wells Fargo ultimately wrote off $121,550.38 it was owed.

75. On or about March 9, 2015, 9107 Dara Lane LLC entered into a sales contract to "flip" the property for $669,000.

(All in violation of Title 18, United States Code, Section 1349.)

## COUNTS TWO THROUGH FOUR
### (Bank Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

76. The allegations contained in paragraphs 1 through 75 of this Indictment are realleged as if fully set forth herein.

77. From at least in or around June 2012 and continuing through at least in or around October 2016, in the Eastern District of Virginia and elsewhere, the defendant

**ALKESH TAYAL**

did knowingly and intentionally execute and attempt to execute, a scheme and artifice to defraud financial institutions, and to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, financial institutions under the meaning of Title 18, United States Code, Section 20, by means of materially false and fraudulent pretenses, representations, and promises.

78. On or about the dates identified below, in the Eastern District of Virginia, the defendant, ALKESH TAYAL, did knowingly and intentionally execute and attempt to execute the aforesaid scheme and artifice to defraud the financial institutions identified below and to obtain moneys, funds, and other property under the control of those financial institutions by means of materially false and fraudulent pretenses, representations, and promises:

| Count | Short Sale Settlement Date | Property | Affected Financial Institution |
|---|---|---|---|
| 2 | 7/28/2014 | 9107 Dara Lane | RBS Financial Products, Inc. |
| 3 | 8/4/2014 | 7231 Allan Avenue | JPMorgan Chase |
| 4 | 1/15/2015 | 1205 Garfield Street #PH5 | Wells Fargo |

(All in violation of Title 18, United States Code, Sections 1344 and 2.)

15

## COUNT FIVE
## (Money Laundering Conspiracy)

THE GRAND JURY FURTHER CHARGES THAT:

79. From a date unknown, but by at least May 2014, and continuing through at least October 7, 2016, in the Eastern District of Virginia and elsewhere, the defendants ALKESH TAYAL and GERALD ALEX BOUTCHER did knowingly and intentionally combine, conspire, and agree with each other and with other persons known and unknown to the grand jury, to knowingly engage and attempt to engage in a monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the wire transfer of $372,842.62 to Wells Fargo in satisfaction of a loan note, such funds having been derived from a specified unlawful activity, that is bank fraud and conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 1957.

(All in violation of Title 18, United States Code, Sections 1956(h) and 2.)

## Forfeiture Notice

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE FOR FORFEITURE AS DESCRIBED BELOW:

80. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, the defendants are hereby notified that, if convicted of the money laundering offense alleged in Count Five, those defendant(s) shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in the money laundering offense of conviction, or any property traceable to such offenses, including, but not limited to, the following property:

   a. A sum of money, which is at least, $478,842.62 in United States currency, which represents the amount of money involved in violations of 18 U.S.C. §§ 1956(h) and 1957 from Count Five;

   b. Real property located at 2001 15th Street N #1206 Arlington, VA 22201;

   c. Real property located at 7209 Matthew Mills Rd. McLean, VA 22101;

   d. Real property located at 9107 Dara Lane Great Falls, VA 22066.

81. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, the defendants are also notified that, if convicted of any of the conspiracy or bank fraud offenses alleged in Counts One through Four, the defendant(s) shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2), any property, real, or personal, which constitutes or is derived from the proceeds traceable to such offenses, including but not limited to the following property:

   a. A sum of money, which is at least, $2,770,884.32 in United States currency, which represents the amount of proceeds obtained as result of violations of 18 U.S.C. §§ 1344 and 1349 from Counts One through Four;

   b. Real property located at 9107 Dara Lane Great Falls, VA 22066;

  c. 2006 Black Aston Martin DB9, VIN SCFAD02A36GB04646

  82. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by 18 U.S.C. § 982(b) and by 28 U.S.C. § 2461(c), the defendants shall forfeit substitute property, up to the value of the amount described in paragraphs 81 and 82 above, if, by any or omission of the defendants, the property described in subparagraphs 81(b)-(d) and 82(b)-(c), cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been comingled with other property which cannot be divided without difficulty.

(All pursuant to Title 18, United States Code, Section 982(a)(1) and (2); Title 21, United States Code, Section 853(p), and Rule 32.2(a) of the Federal Rules of Criminal Procedure.)

A True Bill

_6/6/19_
Date

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office.

Foreperson

G. Zachary Terwilliger
United States Attorney

By: _[signature]_
Jamar K. Walker
Assistant United States Attorney