**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CASE NO.    1:19-CR-176** |
| | : | **HON. LEONIE M. BRINKEMA** |
| **ALKESH TAYAL** | : | |
| | : | |
| **Defendant.** | : | |

<u>**DEFENDANT'S POSITION ON SENTENCING**</u>

In accordance with this Court's policy regarding guideline sentencing, 18 U.S.C. § 3553(a), and the remedial scheme set forth in *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Hughes*, 401 F.3d 540 (4th Cir. 2005), Alkesh Tayal, by counsel, respectfully submits his position on sentencing.

Based on all of the facts and circumstances of the case, the protracted history of this investigation and prosecution, and the background of Mr. Tayal, a sentence to a three-year term of supervised probation with six months of home confinement is appropriate, just, and "sufficient but not greater than necessary" to meet the objectives of sentencing delineated in 18 U.S.C. § 3553(a).

## I.    <u>Summary of Defendant's Position</u>

On January 8, 2020 Alkesh Tayal pleaded guilty, pursuant to a plea agreement, to Count One of the Indictment, charging him with conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349.  *See* Dkt. # 67-68.  His co-defendant, Gerald Boutcher, entered a guilty plea to the same offense on December 20, 2019.  *See* Dkt. # 61.  On March 13, 2020 the Court sentenced Mr. Boutcher to three years of supervised probation, with six months of home confinement.  *See* Dkt. # 82.  Mr. Tayal now comes before the Court for sentencing on June 19, 2020.

That is the overly simplified procedural history of this case.  This case is about three discrete short sales within a relatively short period of time of each other that occurred within the

context of the aftermath of the financial crisis of 2008-2010 and in the midst of a personal financial crisis for Mr. Tayal.  There is no question that the conduct outlined in the statement of facts is wrong and illegal, and for that, Mr. Tayal will forever be punished by his status as a convicted felon, by his loss of his real estate license and the public knowledge of his activities.  But the context of what took place is exceedingly important:

- This is a man who went through a financial meltdown and the imminent loss of multiple properties, including the home where his special needs daughter and her mother lived.

- When he sought the assistance of a loan modification company, they stole tens of thousands of dollars from him, and he wound up being  a cooperating witness for the FBI in the prosecution of the owner of that company in this Court.

- When Mr. Tayal then sought the help of a bankruptcy lawyer, the attorney stole more than $195,000 from his trust funds, and once again Mr. Tayal cooperated with the FBI in the prosecution of that attorney.

- Mr. Tayal tried in every way he could way to keep his properties and obtain loan modification, only to be told over and over that short sales were the only option.

Those were the circumstances that led to the institution of legitimate short sale transactions, but then also the offense conduct and Mr. Tayal's conviction.  The fraud and wrongful conduct were not his plan or method, although he eventually did not reject the actions that led to his now being a felon.  Interestingly and ironically, each of the  financial institutions listed as victims in this protracted investigation have themselves admitted widespread fraud in their mortgage lending practices since the time of the offense conduct.

At this point, the offense conduct dates back to five to eight years ago, during which time Mr. Tayal's life has been upended.  In addition to being a felon for life, he has now lost his job,

2

his real estate license, his standing in the community and his reputation. There is absolutely no question that adequate deterrence has been effectuated by the myriad ways in which he has been and will continue to be punished. A sentence to a term of supervised probation and home confinement under the circumstances of this case is just, adequate, and in line with the goals of sentencing.

## II. <u>Background</u>

This case has a long and labored history going back to the days of the financial crisis over a decade ago. Mr. Tayal is an experienced realtor with years of excellent service to his clients in the buying and selling of homes, for which he has consistently been commended. But despite being a skilled realtor, he is not a skilled real estate investor. Over many years he invested in numerous properties that, due to market conditions, quickly went upside down in value, finding himself under water as the housing market crashed so that his investments often turned out poorly and into massive liabilities. In the meanwhile, the tenants in his investment properties lost their jobs, and with that, their ability to pay their rents. He lost his liquidity, his life savings, and whatever equity he had in the several properties.

Mr. Tayal's appropriate reaction to the dramatic turn of events was to consult with experts: he retained firm after firm to help him seek loan modifications from the mortgage lenders in a desperate effort to avoid foreclosures as the default notices piled up. He retained a Florida group supposedly expert in such transactions to guide him through this process, only to waste $15,000 on them with no benefit. He then retained the Shmuckler Group, a Vienna, Virginia law and real estate firm that billed itself as a professional loan modification company, only to be bilked by them out of tens of thousands of dollars. Howard Shmuckler would later plead guilty in 2012 before this Court to running a fraudulent mortgage rescue business following an FBI investigation in

which Mr. Tayal assisted the investigators as one of the main victims of Mr. Shmuckler's scheme. *See United States v. Howard Shmuckler*, 1:11-cr-344-LMB.

When Mr. Tayal had no choice but to pursue Chapter 11 bankruptcy in 2009, he retained Virginia attorney Michael Eisner for that purpose. This was a fairly complex bankruptcy petition and Eisner convinced Mr. Tayal to deposit upwards of $300,000 in his trust account, which he did. Rather than help him, Eisner stole at least $195,000 from his trust funds. Eisner would later plead guilty before this Court to running a multi-million-dollar fraud scheme in 2014. To this day, Alkesh Tayal, who again was a cooperating witness, is owed $195,000 in restitution in that case. *See United States v. Michael Eisner*, 1:14-cr-167-CMH.[1]  Needless to say the serial victimization of Mr. Tayal by Virginia lawyers caused great stress and even greater financial distress.

As such , the circumstances in which Mr. Tayal found himself in the 2012 timeframe were desperate and unprecedented for him. It was in that context that Alkesh Tayal turned to Gerald Boutcher, an experienced realtor who marketed himself broadly throughout the local real estate community and beyond as an expert on negotiating and completing short sales. Not only did Boutcher run his own short sale negotiation business, he also taught courses and wrote essays on the subject. Boutcher touted that experience in his later response to the inquiries of the Virginia Department of Professional Occupation and Regulation ("DPOR"): "Since 2010, I have conducted, supervised, or consulted on over 1,000 successful short sales. I am viewed as an expert in this niche industry in our professions. I regularly get calls from realtors and homeowners for guidance and advice."

Alkesh Tayal became one of those homeowners who sought Boutcher's advice and help in getting out from under loans he could no longer afford. Unlike Boutcher, Mr. Tayal was not an

---

[1] Mr. Tayal has received only several restitution payments of approximately $45 per month.

4

expert on short sales, despite his general experience as a realtor.  Therefore,  he relied on Boutcher to lead him through the process just as he had relied on the loan modification companies and attorney Eisner before him.  He wanted his help in order for his daughter and her mother to be able to continue living at the Dara Lane residence, and for him to be able to get his financial house back in order.  Boutcher was fully aware of Mr. Tayal's overall circumstances and inability to continue to carry certain properties as matters stood at that time. In so doing, Mr. Tayal took short cuts and misled the banks on the arms' length affidavits the banks required, in addition to accepting commissions for transactions on which he effectively and improperly wore two hats: homeowner and realtor.  For that, Mr. Tayal accepts full and unequivocal responsibility.

Yet full consideration of the context of his offense conduct, the age of this prosecution, and most importantly the dynamic between Alkesh Tayal and Gerald Boutcher are of utmost importance in fashioning a fair and proper sentencing outcome.  The Government's investigation of this matter began more than five years ago on January 15, 2015.  For some inexplicable reason, however, there were significant gaps in the investigative timeline of this matter, and the Government did not obtain an indictment until June 6, 2019.  In the meantime, Mr. Tayal has lived for years with this investigation and impending indictment hanging over his head as he waited for the other shoe to drop.

And while he awaited his fate, all three financial institutions named as victims in this lengthy investigation and prosecution have admitted to widespread fraud in their mortgage-backed securities businesses or their lending and bankruptcy practices—all of which helped precipitate the very collapse of the housing market that landed Mr. Tayal in the difficult position he was in when he engaged in the offense conduct.  RBS Financial Services settled with the Department of Justice in 2018 for $4.9 billion to resolve claims of misleading investors in the underwriting and

issuance of residential mortgage-backed securities.[2]  Wells Fargo settled with the DOJ in 2018 for $2.09 billion for similar misconduct.[3]  And JP Morgan Chase has multiple settlements for fraudulent practices related to its mortgage lending and bankruptcy practices, including a $614 million settlement with the U.S. Attorney's Office for the Southern District of New York and a $50 million settlement with the DOJ Trustee Program.[4]

While Mr. Tayal is unquestionably accountable and accepts full responsibility for his role in misrepresenting facts to these financial institutions, his co-defendant is undeniably the expert who was steering the transactions as the Government clearly recognizes.  Assistant United States Attorney Jamar Walker, who has been involved in this investigation from the start in 2015, put it clearly and succinctly at Boutcher's sentencing:

> **This crime does not happen without Jerry Boutcher's expertise**.  He was an expert negotiator.  He provided advice to Mr. Tayal on how to respond to inquiries that would have gotten at the root of what was really going on here.  He used his knowledge and his connections to drive the prices down.  He even told Mr. Tayal in one e-mail that you need to change this designation or else this excess money will go back to the bank.

Boutcher sentencing transcript, at 6 (emphasis added).  Indeed, the email exchanges between the two unmistakably demonstrate that Boutcher was fully in charge at every stage of the transactions. He would even ghost write emails for Mr. Tayal and confidently projected an air of expertise and

---

[2] Settlement agreement available at https://www.justice.gov/opa/pr/royal-bank-scotland-agrees-pay-49-billion-financial-crisis-era-misconduct.  RBS no longer exists as a corporate entity and completely gutted its mortgage line of business.

[3]  *See* https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-209-billion-penalty-allegedly-misrepresenting-quality-loans-used

[4]  *See* https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-sues-and-settles-jpmorgan-chase-614-million-fraudulent-mortgage; and https://www.justice.gov/opa/pr/us-trustee-program-reaches-50-million-settlement-jpmorgan-chase-protect-homeowners-bankruptcy.

confidence as Mr. Tayal followed his lead.  There is no doubt that Gerald Boutcher was the leader between the two and more culpable than Mr. Tayal.

On March 13, 2020, the Court sentenced Mr. Boutcher to three years of supervised probation, with the first six months of supervision to be served under home arrest with electronic monitoring.  Mr. Tayal should not serve a more severe sentence than that.

### III.    PSR Objections and Sentencing Guidelines

Mr. Tayal submits the following objections to the Presentence Report.

First, Mr. Tayal objects to the restitution amount calculated by the PSR in Paragraph 85. However, given good faith exchanges, Mr. Tayal and the Government have since reached an agreement on the issues of restitution and forfeiture, as described below in Section VI of this Memorandum, and agreed orders on both issues will be presented to the Court.

Second, Mr. Tayal objects to the loss calculation for sentencing guidelines purposes in Paragraph 91 of the PSR.  The correct and most reasonable calculation of loss for those purposes is $94,393.65, which reflects the total improper commissions received by Mr. Tayal from the three transactions.  This results in a 6-level increase in the offense level rather than 8.  The commentary to § 2B1.1 provides that "loss" is the greater of actual or intended loss.  Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense."  Intended loss is "the pecuniary harm that the defendant purposely sought to inflict."  The commentary further states: "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."

There is no indication in this case that Mr. Tayal intentionally sought to inflict pecuniary harm on the banks, and the Government's calculation of the loss amount includes amounts that were not attributable to Mr. Tayal.  In reality, as discussed further below, there is simply no

evidence beyond speculation that the banks actually lost any money on these transactions.  Any attempt to quantify the "actual loss" or "intended loss" here would be guesswork at best.  The most accurate and least speculative calculation of loss here for guidelines purposes is the commissions paid by the banks as follows:

- Dara Lane:          **$76,711.30**

- Allan Avenue:           **$3,533.93**

- Allan Avenue resale:   **$14,148.42**

- Total = **$94,393.65**

The Government's calculation of loss includes figures that were not actual or intended losses.  The Government includes a $30,500 payment to United Project Management Group LLC, which was included in the HUD-1 for the September 29, 2014 closing on Allan Avenue.  However, this amount reflected a repayment of sellers' expenses that had been previously paid by UPMG and Scott Shawkey, who was a 50% owner of UPMG, in order to release a lien on the property, rather than a gain to Mr. Tayal.  The Government also includes $1,065.44 in the commission calculation on the Allan Avenue resale for a total of $15,426.  However, this figure was a payment to sales agent Glen Feagers and is not a loss or gain attributable to Mr. Tayal.  Finally, the Government includes $31,020 in loss for a realtor commission refund to the purchaser documented on the HUD for the Garfield transaction.  That was a mistake in the settlement paperwork that was promptly corrected and returned to the bank, and is therefore not properly assessed within the loss calculation.   Accordingly, the correct loss calculation for guidelines purposes is $94,393.65.

This results in a total offense level of 11 and a guidelines advisory range of eight to 14 months.  However, for the reasons stated below, a sentence below the guidelines range is appropriate in this case.

Additionally, Mr. Tayal notes the following correction to Paragraph 116 of the PSR: Mr. Tayal's real estate license in Virginia was returned to DPOR on March 9, 2020, and he is no longer licensed as a realtor in Virginia.

Footnotes 1 and 2 on Page 21 also should be corrected as follows:

- Footnote 1 should state: This home was purchased in 2006 for $979,000 and has a mortgage balance of $1,204,000 and has a fair market value of **$1,050,000** (not $1,250,000).

- Footnote 2 should state: The defendant purchased this residence for $510,000 in 2001 and has a mortgage balance of $637,560. This is also crossed against Dara Lane ($2.2 million). This has a market value of $1,250,000.

## IV.   **Application of the Sentencing Factors**

In light of the relative culpability of Mr. Tayal and Mr. Boutcher and the myriad ways in which Mr. Tayal has already been (and will continue to be) punished severely, and application of the 18 U.S.C. § 3553 factors, a sentence that is no greater than that imposed on Mr. Boutcher is appropriate and fully satisfies the goals of sentencing.

### A.  **Nature and Circumstances of the Offense and History and Characteristics of Mr. Tayal.**

Alkesh Tayal is a 49-year-old former realtor who comes before the Court for sentencing following his guilty plea to one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349.  Prior to the circumstances that led to his offense conduct and now his conviction, Mr. Tayal had an unblemished background as an engaged community member, actively involved and loving father to his now 14 year-old daughter, and a successful and well-liked realtor of many years.  When his father suddenly passed away in 2000, his mother fell into a deep depression, and it was Kesh Tayal who stepped up to the plate to take care of his mother and his younger sister,

9

both financially and emotionally.  As the letter from his mother to the Court describes, he sacrificed his time and personal pursuits for the sake of his family, just as he has often done for the many individuals who have enthusiastically written letters of support to the Court.    The support letters are important not for the quantity but for the quality of those who have written and demonstrated ongoing support for Mr. Tayal despite being aware of what he has done and his status as a felon.

As the PSR notes, Mr. Tayal has no prior criminal history and no issues of substance or alcohol abuse.  He was, and remains, very close to his family, which resides locally in McLean. He was well-liked by his clients, well-respected by his colleagues, and admired by those who came to know him.  In his years as a realtor, he has never had a single client complaint despite the many transactions he handled.

Despite that positive and promising background and lifestyle, Mr. Tayal found himself in dire financial straits caused by the housing market crash and the resulting loss of value on multiple properties he had purchased.  He became the victim of two lawyers he trusted, but who in the end turned out to be thieves, significantly contributing to his distress and financial devastation.  He received numerous foreclosure notices, and most importantly for him, he faced the impending foreclosure on his largest property on Dara Lane in Great Falls, where his daughter and her mother resided.  As the PSR notes, his daughter suffers from Attention Deficit Hyperactivity Disorder and requires prescription medication for that condition. In addition, she is a very sensitive child who received special education from the school she was enrolled in while living at Dara Lane and for whom change can be very difficult.  Providing her with continued stability in her home with her mother was a primary goal for Mr. Tayal as he sought to avoid foreclosure.

To that end, he repeatedly sought loan modifications from the banks prior to 2012.  But he was invariably turned down and advised that a short sale was the only option.  Between his

bankruptcy in 2011 and his repeated and failed efforts at loan modifications using different firms, Mr. Tayal had hundreds of thousands of dollars stolen from him, most of which he has not and will never recover.   Those losses only added to his financial constraints and desperate circumstances.

Kesh Tayal knew Gerald Boutcher on a social basis and believed he was a person of integrity.  Boutcher marketed his skills in short sales and eventually purported to help Mr. Tayal negotiate with the banks.  Early on in the negotiations with Nationstar Mortgage, which serviced the Dara Lane mortgage on behalf of RBS Financial Services, Mr. Tayal provided a signed third-party authorization to allow Mr. Boutcher to negotiate on his behalf.  From then on, Mr. Boutcher was in every way the leader in the negotiations, the correspondence with the banks, and the decision-making at every step.  To be clear, Mr. Tayal is fully responsible for his actions, and no amount of involvement by Mr. Boutcher minimizes that or absolves him of blame.  For that, he has taken full and unequivocal responsibility, as indicated by his statement in the PSR.

But there is no denying, and the Government agrees, that but for Gerald Boutcher, none of the offense conduct here would have even been possible, let alone attempted.  It is clear from the email exchanges that Boutcher was directing Mr. Tayal as to what to do at every step, and Mr. Tayal's poor judgment in going on board with Boutcher's approach and taking short cuts to get these transactions completed is what led to his conviction and all the collateral consequences that he has and will continue to face.

It is now at least six years since the date of these transactions, and Mr. Tayal has been under law enforcement scrutiny since the beginning of 2015.  He has retained counsel since then and remained under the constant pressure, anxiety, and uncertainty of not knowing when he will be charged, whether he will be able to continue working as a realtor and be able to provide for his

daughter and her mother, and whether he will lose his properties that were acquired prior to the offense conduct.  While he was not in custody during those five plus years, there is no question that this time period was one of punishment and real consequences for his actions.

In addition to this prosecution, Mr. Tayal faced a DPOR investigation and license suspension, and he has now lost his realtor license prior to sentencing.  Regardless of the particular sentence ultimately imposed by the Court, Mr. Tayal's life has been irrevocably changed for the worse as a result of his poor judgment in these transactions six years ago.

Nonetheless, Alkesh Tayal has always been industrious and a hard worker.  He continues to benefit from the substantial support of his family, friends, and former clients and colleagues, who have vowed in their letters to this Court to continue supporting him in any way possible. Their letters to the Court demonstrate the real character of Mr. Tayal, who is not defined by his actions in the 2012-2014 timeframe, but rather by his generosity, selflessness in dealing with his loved ones, and commitment to being the best father, brother, and son he can be.  *See* Exhibit 1 (collection of support letters).

Again, the enclosed support letters are notable for their quality and depth and the heartfelt expressions of support they contain.  These letters describe Mr. Tayal as well-liked and well-regarded, "respectful, loving, smart, and hardworking," "charitable," "an excellent father," "a good person with a good heart," a man of "professionalism and high moral character," a "good and kindhearted person," and "a friend who would give you the shirt off his back."  They describe a man who selflessly serves others, including an elderly woman and double liver transplant patient whom he spent much time serving, buying her groceries, taking her to doctors' appointments, and regularly checking up on her.  Just as importantly, the letters also describe the sincere remorse that Mr. Tayal has expressed to those close to him about his actions.  That is who the real Alkesh Tayal

is, and there is no doubt that he will come out of this unfortunate experience as a better man and once again a positive contributing member of his community.

**B.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment for the Offense, and Afford Adequate Deterrence.**

The sentence requested herein sufficiently reflects the seriousness of the offense and is a just punishment for the offense conduct, while simultaneously meeting the goals of sentencing and promoting respect for the law.  Alkesh Tayal stands today before the Court as a convicted felon for life.  He has lost his realtor license.  He has lost his job with Keller Williams, and then with Long and Foster, and along with that lost his hard-earned future earning ability.  His civil rights, including the right to vote and serve on a jury, have been lost.  He faces impending forfeiture and restitution orders that are substantial and are being paid up front so the Government does not have to deal with the work and expense of seizing assets and trying to liquidate them.  That said, the funds are for the most part borrowed and must be repaid, which is yet another burden on Mr. Tayal. And perhaps most importantly, he has lost his standing and reputation in the real estate community and beyond, which he worked for many years to develop.  Without a doubt, Mr. Tayal has been and will continue to be harshly punished by his conviction in ways that are reflective of the seriousness of his offense and in a manner that will promote respect for the law.

There is also no question that the numerous consequences faced by Mr. Tayal as a result of his offense afford more than adequate general deterrence against similar conduct.  Over the course of his lifetime, the felony conviction and loss of his earning potential, along with the collateral consequences of his conviction, are far greater punishments than a term of incarceration. The myriad laws, rules, and regulations that discriminate against ex-offenders and prevent their reintegration into the community were poignantly described by Judge Frederick Block of the

13

Eastern District of New York as "a form of 'civil[l] death' that send[s] the unequivocal message that 'they' are no longer part of 'us.'" *United States v. Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073, at *1 (E.D.N.Y. May 24, 2016).  The barriers raised by ever-expanding collateral consequences, branding so many millions with the "Mark of Cain" also carry with them new and potent deterrent effect.[5]  Surely, members of the public who learn of this case will be deterred from ever engaging in similar conduct.

Mr. Tayal's conduct is revealed immediately in a simple Google search of his name.  This prosecution is the first item listed when such a search is made.  There is no way to avoid that presently and in the future.  For a person in the business world any internet search or background investigation will directly show his felony conviction and underlying conduct.

Based on his personal history and over five years of conduct since the investigation became known to him, Mr. Tayal has shown that he poses no risk of reoffending.  He has already lost too much to ever consider doing so, and his surrender of his realtor license is in itself a form of incapacitation.  The sentencing guidelines here do not account for a number of significant factors that need to be considered, including the greater culpability of Mr. Boutcher, without whom the offense conduct would not have occurred, the financial desperation and unique economic circumstances that led to the offense conduct, his victimization by two lawyers, the age of the offense conduct, and the otherwise impeccable personal history of Mr. Tayal.  All of these factors militate strongly in favor of a below-guidelines sentence and no active incarceration other than home confinement.

### C.  The Need to Avoid Unwarranted Sentence Disparity.

---

[5]  There are approximately 45,000 laws and rules in U.S. jurisdictions that restrict opportunities and benefits in one way or another based upon a conviction.  *Nat'l Inventory of the Collateral Consequences of Conviction*, available at http://www.abacollateralconsequences.org.

As discussed above, the most relevant case for comparison of sentencing decisions is that of Gerald Boutcher, who received a three-year supervised probation sentence with six months of home confinement.  While the Government will argue that Mr. Tayal benefited more from these transactions than Boutcher did, the reality is that through the short sales Boutcher ended up as the owner of Dara Lane, the most valuable of the three properties at issue.  When the mortgage was refinanced on Dara Lane, he directed Mr. Tayal to cross-collateralize the loan with properties Mr. Tayal owned previously, placing him at greater risk of losing those properties in the event of a default, while Boutcher continued to benefit from being an owner of Dara Lane and collecting rent from Mr. Tayal.  That mortgage remains on Mr. Tayal's property to this day. And while Mr. Tayal was primarily motivated by his need to get out from under mortgages on properties that he was under water on, as well as maintaining his daughter's stable living and education situation, Boutcher was not in any financial constraint when he engaged in his conduct and directed Mr. Tayal on how to interact with the banks.  Accordingly, a sentence more severe than that imposed on Mr. Boutcher would be greater than that necessary to meet the goals of sentencing and would lead to an unwarranted disparity for similar conduct.

**V.      The Court Should Consider the Current COVID-19 Crisis in Fashioning an Appropriate Sentence.**

In determining whether any period of incarceration beyond home confinement is appropriate, the Court should take into account the unprecedented public health crisis the nation faces and its direct and substantial impact on local jails and the Bureau of Prisons.  In an April 3, 2020 memorandum to the BOP, Attorney General William Barr directed the BOP to evaluate all inmates for release to home confinement if they are deemed suitable candidates for such a disposition, even if GPS monitoring is unavailable.  Memorandum for Director of Bureau of Prisons, April 3, 2020, *available* at

15

https://www.fd.org/sites/default/files/covid19/sentencing_advocacy/barr_memo_caresact_apr3_2020.pdf.  This memorandum highlights the extent of the spread of COVID-19 within the BOP system and the need to protect current and future inmates and staff against further spread of the virus.  Needless to say, in the more than two-month period since that memorandum went into effect, the number of infections has only increased across the country.

Of course, if the sentencing factors strongly supported the need for an active period of incarceration, or if Mr. Tayal posed a danger to the public requiring incapacitation, the COVID-19 crisis would not be a standalone basis not to impose active incarceration.  But the facts and circumstances of this case strongly support a probationary sentence with home confinement, and the ongoing pandemic further militates in support of such a sentence.

## VI.   **Restitution and Forfeiture**

In his Plea Agreement, Mr. Tayal agreed that restitution is mandatory pursuant to 18 U.S.C. § 3663A, and that he must forfeit any assets derived from the offense conduct.  *See* Dkt. # 67, ¶¶ 9, 13.  Mr. Tayal and the Government have since reached agreements on both restitution and forfeiture by which Mr. Tayal will agree to pay $126,511.49 in restitution and $173,488.51 in forfeiture, within 60 days of his sentencing.  Upon entry of the agreed forfeiture and restitution orders, prompt and full payment will be made by Mr. Tayal. A car valued at $35,500.00 has already been seized and sold by the Government which will retain that $35,500.00 in liquidation proceeds as well.

## VII.   **Sentencing Location in the Event of Incarceration**

While it is hoped this issue will not have to be addressed, in the event that an active period of incarceration is imposed, Mr. Tayal respectfully requests that the Court recommend that the Bureau of Prisons designate him to FCI Cumberland and to allow self-surrender.

16

## **CONCLUSION**

The Court's decision in imposing a sentence here is unquestionably a difficult one.  The Court has many considerations to weigh, including Mr. Tayal's conduct and background, the sentencing guidelines, and the needs of society at large.  But there is no question that Mr. Tayal has been amply punished in a manner that serves the needs of punishment and individual and general deterrence.  His fall from grace has been hard and impactful.  His daughter and her mother no longer reside in the home he sought so hard to preserve for them.  He will be paying $300,000.00 of borrowed funds between forfeiture and restitution.  And he will lose his liberty for a period of time if home confinement is ordered as requested herein. Any person who has knowledge of this case will learn that the results of such conduct are severe and be deterred from similar activities.

These and the many other collateral consequences of Mr. Tayal's conduct are significant, and the imposition of any active period of incarceration, especially in the midst of a severe and fast spreading virus pandemic, would be greater than necessary to meet the needs of sentencing. Mr. Tayal's sole focus going forward is on being the best father he can be to his teenage daughter, being the best son he can be to his elderly and ill mother, and rebuilding his life and career in a productive and positive manner.  With the unwavering support of his friends and family, he will undoubtedly succeed in that pursuit.

For all these reasons, Alkesh Tayal, by counsel, respectfully requests a sentence of three years of supervised probation, with six months of home confinement.

Respectfully Submitted,
Alkesh Tayal,
By Counsel

GREENSPUN SHAPIRO PC

17

BY:＿＿＿＿＿＿/s/＿＿＿＿＿＿
     Peter D. Greenspun
     Virginia Bar No. 18052
     Muhammad Elsayed
     Virginia Bar No. 86151
     3955 Chain Bridge Road
     Second Floor
     Fairfax, Virginia 22030
     (703) 352-0100
     (703) 591-7268
     pdg@greenspunlaw.com
     me@greenspunlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 12, 2020, I electronically filed the foregoing pleading with the

Clerk of Court using the CM/ECF system, which then sent a notification of such filing (NEF) to

the following:

Jamar Walker, Esquire
Kimberly Riley Pedersen, Esquire
United States Attorney's Office,
Alexandria Division
2100 Jamieson Avenue
Alexandria, Virginia 22314
Jamar.K.Walker@usdoj.gov
Kimberly.Riley.Pedersen@usdoj.gov

_____
/s/
Muhammad Elsayed

19